Filed 5/23/22  Busby Family, LLC v. Zervos CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| BUSBY FAMILY, LLC et al.,<br><br>    Plaintiffs, Cross-defendants and Appellants,<br><br>            v.<br><br>ANDREW G. ZERVOS et al.,<br><br>    Defendants and Respondents;<br><br>SUMMER Z CORP.,<br><br>    Defendant, Cross-complainant and Respondent. | G059220<br><br>(Super. Ct. No. 30-2017-00900308)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Robert J. Moss, Judge.  Affirmed in part, reversed in part, and remanded.  Motion for judicial notice.  Granted.

David B. Dimitruk for Plaintiffs, Cross-defendants and Appellants.

Morasse Collins & Clark and Steven R. Morasse for Defendants, Cross-complainant and Respondents.

# INTRODUCTION

Following heavy rainfall, water seeped through the ceiling of a building under lease for use as a restaurant and caused significant damage to the kitchen area. The culprit was the condition of the 37-year-old roof, which had a useful life, at most, of 25 years, and a questionable maintenance record. When the rains came, a plastic membrane was being installed over the roof structure, but work had stalled because the landlords and the tenant could not reach an agreement about which was responsible for disassembling and removing various items of equipment and debris from the roof to permit the roofing work to be completed. And life being what it is the rainwater leaked into the building through the very section of the roof over which the membrane had not been installed.

This appeal centers on the rights and duties of the parties to that lease with regard to making repairs to the interior of the building, maintaining and repairing the roof, completing the roofing work or replacing the aging roof, and disassembling and removing the equipment on the roof. The landlords are Busby Family, LLC (Busby Family), Goldenwest/Edinger, L.P. (Goldenwest), and The Frank M. and Gertrude R. Doyle Foundation, Inc. (the Doyle Foundation). They are referred to collectively as the Landlords. The tenant is Summer Z Corporation (Summer Z).

The Landlords sued Summer Z, along with Andrew Zervos, Cindy Zervos, Shado Zervos, and Lily Brie Corporation (Lily Brie Corp.)[1] for negligence, nuisance, waste, breach of contract, injunctive relief, and ejectment. The Landlords alleged Defendants were in breach of the lease by failing to repair in a timely manner the damages to the ceilings and walls of the restaurant caused by the rainfall, properly maintain and repair the leaky roof, procure and maintain insurance required by the lease,

---

[1] Summer Z, Andrew Zervos, Cindy Zervos, Shado Zervos, and Lily Brie Corp. are referred to collectively as Defendants. Andrew Zervos and Cindy Zervos are husband and wife. Shado Zervos is the son of Andrew and Cindy Zervos.

2

and have a functioning makeup air unit. Defendants filed a cross-complaint for breach of contract and declaratory relief. Each side claimed the other had the duty to replace the roof or complete the installation of the membrane, as well as to disassemble and remove the various items of equipment on the roof. The Landlords contended the roof failure was attributable to poor maintenance and repair by Defendants; Defendants responded the roof failure was due its age.

Following a bench trial, the trial court found against the Landlords on their complaint and in favor of Defendants on their cross-complaint. The court issued a mandatory injunction requiring the Landlords to complete the reroofing of the building and, at their own expense, remove the equipment from the roof.

The Landlords' appeal presents a host of issues. Although these issues can be quite complicated, certain core themes appear and are repeated in the Landlords' appellate briefs: (1) the trial court failed to make necessary findings on whether Defendants breached compliance with laws and the maintenance and repair provisions of the lease; (2) Defendants failed to comply with the California Retail Food Code (Health & Saf. Code, § 113700 et seq.); (3) the trial court's statement of decision includes a finding of a dangerous condition on the roof that contradicts or negates other findings; (4) the Landlords did not use the equipment on the roof and therefore were not responsible for it; (5) the trial court's conclusion the Landlords had the duty to replace the roof was "*ex nihilo*" (out of nothing); and (6) the lease imposed on Defendants the duty to replace the roof. We address these themes in the course of deciding this appeal.

We affirm, with one exception, the judgment in favor of Defendants on the Landlords' causes of action for breach of contract, negligence, nuisance, and waste. The Landlords' breach of contract cause of action was limited by the scope of a 30-day notice to perform covenants or quit, which did not mention the roof or cite its condition as a breach of the lease. Whether Defendants were liable for the condition of the roof and whether they had the duty to pay for its replacement therefore are issues that were not

3

squarely before the trial court and are not before us. The trial court's findings in the statement of decision, though barebones, were legally sufficient and withstand scrutiny under the relevant standard of review. The one exception to affirmance on the complaint is that we find the trial court legally erred in concluding the tenants were not required by law to have a makeup air unit at the restaurant.

We reverse the judgment in favor of Defendants on their cross-complaint. The trial court erred by issuing an injunction requiring the Landlords to complete the reroofing work. No express lease provision imposes that duty on the landlord, and injunctive relief could only be based on the lease. The trial court erred by concluding injunctive relief could be based on an oral contract, promissory estoppel, or breach of the implied covenant of good faith and fair dealing because Defendants did not plead any of those causes of action. The court erred by concluding the injunction could be based on a landlord's tort liability to third parties for a dangerous condition on the leased premises. That duty exposes the landlord to liability for damages and does impose an affirmative duty on the landlord to remediate the condition.

The maintenance and repair provision of the lease does not impose on the tenant the duty to replace a dilapidated roof or make substantial repairs. But that does not mean, as Defendants contend, the landlord has such duty by default: When no express covenant requires a landlord to replace a dilapidation, and no government rule or order specifically directs the dilapidation be rectified, it is possible that no party to the lease has such a duty. That is the situation here.

Finally, the trial court awarded Summer Z $2,000 in damages based on the Landlords, unreasonable withholding of consent to a sublease. We reverse because those damages were not caused by the Landlords, withholding of consent.

4

## FACTS

### I. The Lease of the Restaurant Building

The Landlords are the fee owners of a shopping center, called Goldenwest Plaza Shopping Center (the Shopping Center) in Huntington Beach. The Shopping Center has several large buildings, including a single-tenant building located at 7148 Edinger Avenue (the Restaurant Building), which was constructed in 1979. In 1993, the Landlords' predecessors in interest entered into a lease of the entire Restaurant Building (the Lease) to Spires Restaurants, Inc. (Spires) for use as a restaurant. On the same day the Lease was made, Spires assigned its tenancy interest in the Lease to Andrew Zervos and Cindy Zervos.

Several provisions of the Lease are of particular relevance to this appeal:

• Paragraph 7 (Default by Tenant) requires the landlord to give the tenant notice of and opportunity to cure a breach of the Lease before the landlord may terminate the Lease or exercise a remedy.

• Paragraph 9 (Compliance with Laws in Use) requires the tenant use the premises "in conformity with all ordinances and laws of Municipal, State and Federal Authorities" and to "make any and all alterations to the premises required in order to comply with any such ordinance or law."

• Paragraph 15 (Damages to Real or Personal Property) provides in relevant part: "Landlord shall not be liable for any damage done to said premises, or any of the fixtures, merchandise, property, or equipment therein contained . . . from any other cause whatsoever, and whether having its origin in the premises hereby demised or any other portion of the building of which said demised premises are a part, or elsewhere."

• Paragraph 21 (Compliance with Laws by Tenant) provides in part: "Tenant shall at its sole cost and expense, comply with all of the requirements of all Municipal, County, State, and Federal authorities now in force, or which hereafter be in

force, pertaining to said premises, in any manner whatsoever." We sometimes refer to paragraph 21 as the compliance with laws provision.

• Paragraph 35 (Repairs) provides in relevant part: "Tenant shall, at its sole cost, keep and maintain said premises and appurtenances and every part thereof, including the exterior walls structure, glass and roof, in good and sanitary order, condition, and repair, hereby waiving all right to make repairs at the expense of Landlord." We sometimes refer to paragraph 35 as the maintenance and repair provision.

• Paragraph 36 (Insurance) requires the tenant, at tenant's expense, to procure and maintain in full force and effect, throughout the term of the Lease, public liability insurance, fire insurance on real property, and fire insurance on the tenant's fixtures. We sometimes refer to paragraph 36 as the insurance provision.

The tenancy interest in the Lease was assigned several times and, ultimately, was assigned by Shado Zervos to Summer Z in 2009, on the last day of the Lease term, pursuant to an Amendment and Assignment of Lease dated May 31, 2009 (the 2009 Amendment and Assignment). The Landlords consented to every assignment. The Landlords, Shado Zervos, and Summer Z entered into an amendment to extend the term of the Lease by 10 years with the consequence the Lease would expire on May 31, 2019.

## II. Operation of the Restaurant

In 2008, Shado Zervos applied for and obtained a permit from the Orange County Health Care Agency (OCHCA) to operate a restaurant called Sunny's Waffle House (Sunny's) at the Restaurant Building.

Cindy Zervos formed a company called "Lily Brie, Inc." in October 2009 for the purpose of operating Sunny's at the Restaurant Building. In 2010, Lily Brie, Inc. applied for a permit from the OCHCA to operate Sunny's. The permit application identified the name of the business as "Lily Brie Inc DBA Sunnys" and the legal owner of the business as "Cindy Zervos (President) (Lily Brie Inc)." From January 2013

6

through January 2018, the Landlords accepted rent paid by checks drawn on a bank account owned by Lily Brie, Inc.

Although Cindy Zervos was the president of Lily Brie, Andrew Zervos and Shado Zervos were primarily responsible for operating Sunny's. Andrew Zervos was the primary decision maker and was active in operating Sunny's until sometime in 2018 or 2019.

Thus, as of 2010, Summer Z was the tenant under the Lease, Lily Brie held the health permit from the county, Cindy Zervos as president of Lily Brie was listed as the owner of the business under that permit, and Andrew Zervos and Shado Zervos were primarily responsible for operating Sunny's. Summer Zervos, Shado's sister, also was involved in operating Sunny's.

### III. Roofing Repair Issues

The roof on the Restaurant Building was constructed in 1979 and had a useful life of 12 to 15 years if properly maintained. With proper maintenance, the roof *could* last as long as 20 to 25 years. (Testimony of Landlords' roofing expert, Rick Harris). As of June 2016, the roof on the Restaurant Building was thus 37 years old and had never been replaced.

Various equipment consisting of heating and air conditioning units, a swamp cooler, ducts, vents, and other related equipment (the Roof Equipment) was located on the center part of the roof, above the part of the Restaurant Building that is used as the kitchen. The Roof Equipment was never used by the Landlords and was used only by those persons and businesses that have operated a restaurant there.

In 2015, the property manager for the Shopping Center (Jody Coats) received two estimates from roofing companies. The first estimate, which was prepared in February 2015, was from McDonnell Roofing, Inc. and was for repair of the roof or installment of a new roofing membrane over the roof deck, parapets, and wall flashings on the Restaurant Building. The second estimate, which was prepared in March 2015,

7

was from Highland Roofing and was for repair and/or replacement of all roofs in the Shopping Center, including the roof on the Restaurant Building. The latter estimate describes the roof on the Restaurant Building as "in need of attention." The Highland Roofing proposal was for construction of a new roofing system, not just for installation of a roofing membrane over the existing roof deck.

Coats and Andrew Zervos discussed having roof work done. Andrew Zervos also obtained estimates for roof repairs. It appears none of the bids was accepted; roof repairs were not made.

Later in 2015, Coats received a report dated September 29, 2015, from an insurance company inspector. The report states: "The roof of the [Restaurant] [B]uilding is reportedly leaking. Given the age of the building and the lack of recent upgrading, a licensed contractor should inspect the existing roof and all roof components to determine that it is structurally sound."

## IV. Remodeling the Shopping Center

Sometime in late 2015, the Landlords decided to remodel the entire Shopping Center. An e-mail from Coats to Shado Zervos dated January 5, 2016, included a list of noncompliant safety features which had been identified in the September 29, 2015 report. At the top of the list is: "Significant roof damage." The e-mail states, "With the exception of the new roof, you will be required to correct these items accordingly within the next 90 days or no later than March 31st. . . . We are getting closer to starting the remodel of the center and can schedule the roof work at that time." Andrew Zervos testified (at deposition, received into evidence at trial as exhibit No. 347) Coats had told him the Shopping Center was going to be remodeled, the roofs were going to be replaced, the tenant was responsible for the cost of replacing the roof on the Restaurant Building, and his portion of the cost would be $40,000.

8

Sometime in 2016, the Landlords entered into a contract with a general contractor for remodeling the Shopping Center. The remodeling project included "re-roofing" throughout the Shopping Center. The remodeling began in June or July 2016.

## V. Contract to Perform Roofing Work at the Restaurant Building

In October 2016, the Landlords entered into a separate contract with Bishop, Inc. (Bishop) to perform roofing work on the Restaurant Building. The scope of the roofing work for the Restaurant Building was called "TPO Overlay" and involved the installation of a thermoplastic polyolefin (TPO) membrane over the existing roof, installation of TPO membrane "accessories," and replacement of any poor or damaged plywood sheathing. The contract excluded disassembling and removal of the Roof Equipment. Bishop's bid described the Restaurant Building roof as being "in poor condition with a remaining service life of 0-2 years."[2]

Bishop was able to install the roof membrane over the perimeter area of the roof. But the Roof Equipment prevented Bishop from completing the roofing work on the center portion of the Restaurant Building.[3]

## VI. Impasse Over Responsibility for Disassembling and Removing the Roof Equipment

Heavy rainfall in mid-October 2016 caused damage to the ceiling above the kitchen in the Restaurant Building. The damage caused by the heavy rains emphasized

---

[2]   Throughout the litigation, both at trial and on appeal, Defendants and the trial court have used the terms "new roof," "roof replacement," and "re-roofing" indiscriminately. The bids from McDonnell Roofing and Highland Roofing, and the bid from and contract with Bishop, illustrate, however, the great variation in the type and scope of roofing work considered for the Restaurant Building. The McDonnell Roofing bid and the Bishop contract encompassed only the installation of a plastic membrane over the existing roof structure. In contrast, the Highland Roofing bid encompassed removal of the existing roof structure and replacing it with a new roof structure. For those reasons, we use the term "roofing work" to describe the scope of work to be performed by Bishop on the Restaurant Building.

[3]   Jake Pinedo (Bishop's operations manager) testified there were two ways to install a roof membrane when there is equipment or machinery on the roof. The first way is to raise the equipment by jacking the equipment high enough in the air to install the new roof membrane underneath. The second way is to disassemble and remove the equipment from the roof. Bishop testified he never disassembles and removes roof equipment but will only use the first method.

9

the need to complete the roofing work on the Restaurant Building. In late October, Pinedo determined that Bishop would not be able to disassemble and remove the Roof Equipment due to its extremely poor condition.

In an e-mail message dated October 27, 2016, Jim Neiger (president of the management company) informed Summer Zervos: "[U]ntil recently we did not even realize the poor condition of your equipment and ductwork . . . . This is interfering with our roofer[']s ability to even start with the roof work in this area. The poor condition means he cannot disassemble the equipment without causing the equipment to break." In addition, a rusted and unused sheet metal "cage" and louvered vent had been discarded on the roof. The only way to fix the center section of the roof, Neiger explained, was to remove the Roof Equipment, and, once the new membrane was installed, reinstall the Roof Equipment.

As the roofing work progressed, the extensive ducting on the roof was discovered to have open holes, corrosion, split sealant, and cracked seals, and was not repairable. The roof's condition was described as "beyond poor." Pinedo identified several areas on the surface of the center of the roof on which a black mastic material and another waterproofing material called elastometric had been applied to the roof as a means of preventing rainwater from seeping through the roof and into the Restaurant Building.[4]

The Landlords and Defendants reached an impasse over who should pay for disassembly and removal of the Roof Equipment. Each side claimed the other side owned the Restaurant Equipment and had to pay for its disassembly, removal, and reinstallation. By letter dated November 15, 2016, the Landlords' attorney made a demand on Defendants to "[m]ake arrangements to disassemble and remove the

---

[4]     Andrew Zervos testified he had sealant applied to a portion of the roof to stop rainwater from seeping into the Restaurant Building. He did not precisely say when the sealant was applied, but it appears to have been before September 2007, when the Lease was assigned to Bonnie M. Henson and Alfred R. Henson, Jr., before being re-assigned to Shado Zervos.

10

equipment on the center part of the roof so that . . . the owners'[] roofing contractor may commence and complete the work it was hired to perform in that center portion of the roof."

Defendants undertook no actions to disassemble and remove the Roof Equipment. In an e-mail dated December 14, 2016 to Defendants' attorney, the Landlords' attorney wrote: "[I]t looks like the question should be put to your clients: when are the tenants going to make arrangements for the disassembly and removal of the equipment so that the roof work can commence?"

Because the impasse over disassembly and removal of the Roof Equipment did not resolve, Bishop could not complete the roofing work on the center part of the roof, and Bishop gave the Landlords an invoice credit of $17,569 for the uncompleted roofing work. The roofing work on the remainder of the Restaurant Building was completed.

### VII. Rainwater Damage to the Ceiling and Walls of the Restaurant Building

Rainwater leaking through the roof caused extensive damage to the ceiling above the kitchen, the dry storage room, and the dishwashing area, and some walls inside the Restaurant Building. In the November 15, 2016 letter, the Landlords' counsel made a demand on Defendants to "[m]ake arrangement for the immediate repair of the ceiling drywall inside of the [R]estaurant [B]uilding that has buckled and that has actually separated and is hanging from the ceiling." Defendants undertook no repair work in November 2016.

Patrick Doyle, the president of the Doyle Foundation, visited the Restaurant Building on December 13, 2016. He noticed the kitchen ceiling had been covered with plastic sheeting called visqueen. When he asked to see what was behind the visqueen, Doyle was sent a photograph depicting a black substance sagging down from the

11

plywood. Doyle initially thought the black substance might be mold but it turned out to be tar from the roof.

The next day, Defendants' attorney sent the Landlords' attorney an e-mail touching on several subjects, including the roof ("the roofing issue has to be resolved"), and advising that nobody from the Landlords or the management company would be allowed to enter the Restaurant Building for purposes relating to the dispute without his or Defendants' permission.

In early December 2016, Summer Zervos engaged Harbor Construction Group (Harbor) to "demolish and remove drywall and ceiling systems" and "replace drywall and ceiling systems" in the kitchen, dry storage room, and dishwashing area. Harbor subcontracted with a roofing company (Prime Waterproofing) to fix the ceiling leaks by installing "[t]emporary roof repair." On December 12, 2016, Defendants' attorney notified the Landlords' attorney the remediation and repair work would begin that week, and Harbor started the remediation and repair work on December 13. On December 13, the Landlords' attorney gave notice by e-mail that Defendants were in breach of paragraph 43 of the Lease by failing to obtain the Landlords' consent to this work. On December 21, 2016, Summer Zervos formally requested the Landlords to consent to the remediation and repair work being performed by Harbor. The Landlords did not do so.

On January 5, 2017, the Landlords conducted an inspection of the interior of the Restaurant Building. Doyle, who attended the inspection, testified he saw a considerable amount of water dripping from light fixtures. Harris, a roofing consultant engaged by the Landlords, also attended.

By January 5, 2017, Harbor had removed the damaged drywall and installed new drywall in the kitchen, dry storage room, and dishwashing area, and had placed plastic under the ceilings to prevent water from leaking into the Restaurant Building. Harbor and Prime Waterproofing completed the work they were hired to do.

12

## VIII.  Notices of Default of the Lease

The Landlords served a 30-day Notice to Perform Covenants or Quit dated December 6, 2016 (the 30-day Notice) on Shado Zervos, Summer Zervos, Andrew Zervos, Cindy Zervos, and Summer Z.  The 30-Day Notice identified three categories of lease violations:  (1) failure to provide insurance and policy endorsements as required by paragraphs 36 and 48 of the Lease; (2) failure to repair the damaged ceiling and walls in violation of paragraphs 9, 11, and paragraph 35 of the Lease; and (3) failure to have a functioning makeup air unit at the Restaurant Building.[5]

On December 22, 2016, Summer Zervos, on behalf of Summer Z, served the Landlords with three notices of default under the Lease.  The first and third notices are relevant to this appeal.  The first notice of default (Notice of Default No. 1) asserted the Landlords had failed to comply with their obligation under the Lease of "replacing the entire roof of the Premises, not just the perimeter."  In a letter served with the Notice of Default No. 1, Summer Zervos wrote:  "As you know, Landlord has replaced the perimeter of the roof but not the entire roof.  The center portion of the roof cannot be repaired and must be replaced.  Roof replacement is Landlord's responsibility, not ours."

The third notice of default (Notice of Default No. 3) asserted the Landlords had failed to comply with their obligation under the Lease to "replac[e] the makeup air equipment at the Premises."  In a letter served with the Notice of Default No. 3, Summer Zervos wrote:  "As you know, the swamp cooler/makeup air equipment at the premises must be replaced.  Equipment replacement is [the] Landlord's responsibility, not ours."

## IX.  Citations for Code Violations

On November 1, 2016, the OCHCA conducted an inspection of the Restaurant Building in response to a complaint.  According to the inspection report,

---

[5]  A makeup air unit works in conjunction with the exhaust fan to replace the air that is removed from the kitchen by exhaust ventilation equipment.  It prevents negative air pressure in a building, which can create a safety hazard.

13

rodent droppings were found in the crawl space above the restaurant and the prep and storage areas of the restaurant had suffered damage from rainwater leaking through the roof. The inspection report directed the management of Sunny's to "[r]epair the large holes observed in the ceiling in the storeroom and server areas" and to "[r]epair the walls and/or ceiling in order to provide surfaces that are smooth, durable, nonabsorbent, and easily cleanable." No rodent activity was observed during a reinspection on November 8.

During an OCHCA inspection conducted on September 12, 2017, cockroaches and rodent droppings were observed in food preparation and other critical areas. As a consequence, the OCHCA ordered Sunny's to be closed. OCHCA conducted a reinspection on October 4, 2017, concluded "[t]he conditions causing the permit suspension were observed to be corrected," and allowed Sunny's to reopen. Sunny's passed inspections conducted on December 27, 2017, January 3, July 30, and December 18, 2018, and July 11 and November 25, 2019.

### X. Insurance

Defendants secured policies of insurance covering the period September 23, 2013 through September 23, 2019. The policies covering the period September 23, 2013 through September 23, 2017, named Lily Brie Corp. and Sunny's as the insureds. The policy covering the period September 23, 2017 through September 23, 2018, named Lily Brie Corp. and Summer Z as the insureds. The policy covering the period September 23, 2018 through September 23, 2019 named Summer Z as the insured.

A certificate of insurance dated October 24, 2016 identified the insured as "Lily Brie DBA Sunny's Restaurant" and the certificate holder as Goldenwest, and named the Doyle Foundation, Busby Family, Goldenwest, and Essex Realty Management, Inc. as additional insureds. The policy (trial exhibit No. 351) had an endorsement, "Additional Insured – Managers or Lessors of Premises," naming "Goldenwest Plaza c/o Essex Rea" as an additional insured. (Some capitalization

14

omitted.) In January 2017, Defendants obtained a policy endorsement naming, as additional insureds, Goldenwest, the Doyle Foundation, and Busby Family.

Lily Brie Corp. filed an insurance claim with the insurer for policy benefits for damage and loss of business income caused by the roof leaks. The insurer paid Lily Brie Corp. $50,000 on its claim. The Landlords also filed an insurance claim, which the insurer denied on the ground a policy exclusion applied.

## XI. Proposed Sublease to Lily Brie, Inc.

In January 2017, Summer Zervos sent the Landlords a proposed sublease of the Restaurant Building between Summer Z and Lily Brie, Inc. and requested the Landlords' approval. In response, the Landlords requested they be provided a current financial statement from Lily Brie, Inc., various corporate documents and other materials, including "[t]he plan, if any, to specify a date by which all of the equipment on the roof will be disassembled and removed so that the work to repair the damages to the roof may commence." Summer Zervos provided many of the documents requested and provided answers to the questions presented.

The Landlords did not approve the sublease between Summer Z and Lily Brie, Inc. Defendants spent $2,000 to change the names on the permits, licenses, and insurance necessary to operate the restaurant from Lily Brie, Inc. to Summer Z. In February 2017, Summer Zervos, on behalf of Summer Z, served the Landlords with the fifth notice of default, which claimed the Landlords had breached paragraphs 8 and 25 of the Lease by unreasonably and/or arbitrarily withholding consent to the proposed sublease between Summer Z and Lily Brie.

## PROCEDURAL HISTORY

### I. Allegations of the Complaint and the Cross-complaint

On January 30, 2017, the Landlords filed a complaint asserting six causes of action against Defendants: (1) negligence, (2) nuisance, (3) waste, (4) injunctive relief, (5) breach of contract, and (6) ejectment.

15

The complaint alleged: "In October 2016, the Landlords discovered that rain water had caused substantial damage to portions of the interior drywall ceilings and portions of the interior[] walls of the Building. The Landlords subsequently discovered the damages were caused by the negligence of the Tenants by virtue of their (1) failure to perform the covenants and obligations set forth in the Original Lease, (2) failure to preserve and protect the Building, (3) failure to maintain and repair conditions on the roof of the Building, and (4) arrangement of repairs to portions of the roof which were negligently performed." In the breach of contract cause of action, the Landlords alleged Defendants breached the Lease "by failing to (1) install makeup air equipment, and (2) correct, fix, cure, remedy restore and repair the physically damaged condition of the roofs."

In addition to damages, the Landlords sought a judgment authorizing them to reenter and retake possession of the Restaurant Building and to eject Defendants and (apparently in the alternative) requiring Defendants to repair the damaged roof and ceilings.

Summer Z filed a cross-complaint against the Landlords for breach of written lease and declaratory relief. The cross-complaint alleged the Landlords were in breach of the Lease for (1) failing to replace the entire roof on the Restaurant Building and the Roof Equipment, (2) unreasonably withholding consent to having Harbor undertake repair work, and (3) unreasonably withholding consent to the sublease to Lily Brie. In addition to damages and declaratory relief, Defendants sought "injunctive relief ordering Landlord[s] to specifically perform [their] obligations under the Lease."

## II. Trial, Statement of Decision, and Judgment

A bench trial was conducted over five days in January 2020. The trial court issued a tentative decision against the Landlords and in favor of Defendants. The court awarded Summer Z $2,000 in damages on the cross-complaint and ordered the Landlords to complete the roofing project on the Restaurant Building.

16

The Landlords filed a request for a statement of decision in which they asked the court to make findings on 129 issues. Defendants submitted a proposed statement of decision for the trial court's consideration, and the Landlords filed 26 pages of objections to the proposed statement of decision.

The court adopted the proposed statement of decision, with one addition made by Defendants. The trial court did not respond to the Landlords' objections other than to make the notation "objections read and considered" in the upper left-hand margin of the first page of the statement of decision. The contents of the statement of decision, the Landlords' request for a statement of decision, and the Landlords' objections to the proposed statement of decision will be addressed in the Discussion section when necessary and relevant to the issue at hand.

Judgment was entered in accordance with the statement of decision. The judgment awarded the Landlords nothing on their complaint. On the cross-complaint, the judgment awarded Summer Z damages of $2,000 and issued the following injunction: "The Court orders Busby, G/E and Doyle Foundation [the Landlords], and each of them, to complete the re-roofing of the premises at 7148 Edinger Avenue, Huntington Beach, California 92647 [the Restaurant Building] at Cross-Defendants' [the Landlords'] own expense including, but not limited to, the removal and replacement of all roof equipment thereon, within 90 days of when this Judgement becomes final." The judgment declined to order the installation of a makeup air unit but states "if and when any enforcement of a permitting agency requires the installation of such a device, it shall be the responsibility of Cross-Defendants to do so at their expense."

The Landlords timely filed a notice of appeal from the judgment.

### MOTION FOR JUDICIAL NOTICE

The Landlords have filed a motion for judicial notice of a complaint filed by Summer Z in *Summer Z Corp. v. Busby Family, LLC et al.*, Orange County Superior Court case No. 30-2021-01226596-CU-OR-CJC in October 2021 (the Summer Z

17

Complaint).  In the Summer Z Complaint, Summer Z sued the Landlords for breach of written lease and constructive eviction based on allegations the Landlords had failed to replace the entire roof of the Restaurant Building and failed to replace the makeup air unit on the roof.

The Landlords contend the Summer Z Complaint is relevant because it "establishes that the mandatory injunctive provisions in the judgment on appeal are not moot despite the fact that the occupants have vacated the commercial premises involved in this appeal."  Defendants have not brought a motion to dismiss the appeal as moot and did not file opposition to the Landlords' motion for judicial notice.

We may take judicial notice of the Summer Z Complaint because it is a record of court of the State of California.  (Evid. Code, §§ 452, subd. (d), 459.)  However, while we may take judicial notice of the Summer Z Complaint, we may not take judicial notice of the truth of any facts alleged in it.  (*People v. Franklin* (2016) 63 Cal.4th 261, 280; *Espinosa v. Calva* (2008) 169 Cal.App.4th 1393, 1396.)  Thus, taking judicial notice of the Summer Z Complaint would establish Summer Z has filed a complaint and in that complaint is alleging it has been constructively evicted from the Restaurant Building.  But that is all:  The Summer Z Complaint cannot be used to prove Summer Z has in fact vacated the Restaurant Building.  Based on the record before us, Summer Z continues to occupy the Restaurant Building.

We grant the motion for judicial notice, although we find it relevant for a reason not expressed by the Landlords.  The Summer Z Complaint is relevant to show the present appeal is not moot-even if Summer Z has vacated the premises-because the issues we address might have issue preclusive or collateral estoppel effect in that litigation.

## DISCUSSION

### I. Standard of Review

Each side argues for a different standard of review:  The Landlords argue for de novo review while Defendants argue for the substantial evidence standard.  The

trial court issued a statement of decision addressing both factual and legal issues, and, therefore, both standards of review are applicable: "In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo. [Citation.] We apply a substantial evidence standard of review to the trial court's findings of fact. [Citation.] Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

Under the substantial evidence standard, we examine the entire record in the light most favorable to the judgment to determine whether there is evidence that is reasonable, credible, and of solid value to support the judgment. (*Ferguson v. Yaspan* (2014) 233 Cal.App.4th 676, 682.) In undertaking this task, we resolve all conflicts in the evidence in favor of the judgment, we do not reweigh the evidence, and we are bound by the trial court's credibility determinations. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) The testimony of a single witness may constitute substantial evidence. (*Ibid.*) The test is whether the record contains substantial evidence in favor of the respondent, and "[i]f this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

Also relevant to the standard of review is the doctrine of implied findings. "Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).) In a bench trial, an appellant can avoid the doctrine of implied findings by completing a two-step process: "First, a party must request a statement of decision pursuant to Code of Civil Procedure section 632. [Citation.] Second, if the trial court issues a statement of decision, a party claiming omissions or ambiguities in the factual

19

findings must bring the omissions or ambiguities to the trial court's attention." (*Id*. at p. 59.)

"If the party challenging the statement of decision fails to bring omissions or ambiguities in it to the trial court's attention, then, under Code of Civil Procedure section 634, the appellate court will infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues. [Citations.] The appellate court then reviews the implied factual findings under the substantial evidence standard." (*Fladeboe, supra*, 150 Cal.App.4th at pp. 59-60.)

## II. The Landlords' Breach of the Lease Claims

A. *Scope of the 30-day Notice*

The Landlords contend Defendants breached the terms of the Lease in four ways: (1) failing to comply with provisions of the Lease requiring procurement and maintenance of insurance; (2) failing to maintain and repair the Restaurant Building roof and the Roof Equipment in accordance with the Lease; (3) failing to maintain the Restaurant Building and operate the restaurant in compliance with the California Retail Food Code; and (4) repudiating the Lease by serving the notices of default on the Landlord.

The starting point for considering the Landlords' breach of contract cause of action is the scope and content of the 30-day Notice. When a lease requires notice of and an opportunity to cure a default, giving notice is a condition precedent to a suit for breach of the lease. (See *Clark v. Tide Water Associated Oil Co.* (1950) 98 Cal.App.2d 488, 489-491.) Paragraph 7 of the Lease requires the landlord to give the tenant notice of and opportunity to cure a breach of the Lease before the Landlord may terminate the

20

Lease or exercise a remedy.[6] The notice must specify in writing "the nature of such failure" to perform.

In accordance with paragraph 7 of the Lease, on December 6, 2016, the Landlords served the 30-day Notice on Defendants. The 30-day Notice sets out three categories of breaches of the Lease: (1) "The Violation of Your Insurance Obligations," (2) "The Violation of Your Maintenance and Repair Obligations and the Violation of the Obligation to Comply with the Laws," and (3) "Mechanical Code Violations." (Some capitalization omitted.) Under the first category, the Landlords asserted Defendants had failed to maintain the three types of insurance required by Lease paragraph 36. Under the second category, the Landlords asserted: "You are in breach of the provisions of the [L]ease because of your allowance of parts of the ceiling and walls that are damaged and failing in the *interior part* of the Premises to remain unrepaired." (Italics added.) Landlords claimed Defendants had violated Lease paragraphs 9 (Compliance with Law in Use), 11 (No Nuisance or Waste), and 35 (Repairs) "[w]ith regard to the conditions of the ceilings and walls depicted in the photographs above."[7] Under the third category, the Landlords directed Defendants to "arrange for the procurement and installation of makeup air equipment as required by and in accordance with the California Mechanical Code."

The trial court found, "even though the central bone of contention between the parties was the condition of the roof and the resultant leaking, no mention of the roof

---

[6]     Paragraph 7 of the Lease states, in part: "[I]f Tenant shall fail to promptly perform any other covenant, condition, or agreement by it to be performed hereunder, and such failure shall continue for a period of thirty (30) days after notice in writing specifying the nature of such failure, . . . or if Tenant breaches any obligation under this Lease by it to be performed, which cannot be cured, then, and in such event, Tenant shall be deemed to be in default and Landlord, without further notice of any kind, may, at his option, in addition to any and all other rights and remedies Landlord may have under the laws of the State of California then in effect, do the following: [¶] A. Re-enter and take possession of the demise premises. . . . [¶] B. Terminate this Lease at once."

[7]     The 30-day Notice was, it seems, mistaken for citing paragraph 9 of the Lease instead of paragraph 21. Paragraph 9 concerns compliance with all laws in "the use" of the Restaurant Building; for example, the tenant cannot use the Restaurant Building as a brothel. Paragraph 21 is the Lease provision requiring the tenant to incur expenses necessary to bring the Restaurant Building in compliance with all laws; for example, the tenant must pay for pest and vector control.

21

or the removal and replacement of the equipment thereon is made in the 30[-]day notice." We agree: the 30-day Notice makes no mention of the roof or the Roof Equipment (other than the makeup air unit) but cites only damage to parts of the ceiling and walls in the interior of the Restaurant Building.[8] The 30-Day Notice does not identify the failure to repair, maintain, or replace the roof or the Roof Equipment, or to remove the Roof Equipment, as a breach of or failure to perform under the Lease.

Notice specifying the tenant's default was a condition to terminating the Lease or seeking a remedy; therefore, the Landlords could not seek remedies for claims relating to the roof or the Roof Equipment. The Landlords were limited in their breach of the Lease cause of action to seeking remedies for breach of the insurance provision, breach of the maintenance and repair provision, and compliance with laws provision with respect to interior walls and ceilings of the kitchen area of the Restaurant Building, and for mechanical violations with respect to the makeup air unit.

B. *No Breach of the Insurance Provision of the Lease*

1. *The Insurance Provision and the Trial Court's Findings*

Paragraph 36 of the Lease required the tenant, at tenant's expense, to procure and maintain in full force and effect, throughout the term of the lease, public liability insurance, fire insurance on real property, and fire insurance on tenant's fixtures in the amounts and on the terms specified. Paragraph 36.A requires the public liability insurance policy to name the landlord as an additional insured, and paragraph 49 requires all policies be for "the mutual and joint benefit and protection of Landlord and Tenant."

---

[8] As the factual basis for the asserted defaults, the 30-day Notice states: "You are in breach of the provisions of the [L]ease because of your allowance of parts of the ceiling and walls that are damaged and failing in the *interior part* of the Premises to remain unrepaired. Such parts of *the ceiling and walls* have resulted in conditions the are unsafe and pose justifiable risks of injury to persons if left unrepaired. In some instances, the parts of the ceiling that have detached from the wood to which they were attached and are hanging creating a danger of falling and hitting persons or coming in contact with the food and beverages that [are] served at the restaurant. In other instances, the parts of *the ceilings* are in unsafe condition, although they have not detached from the wood to which they are detached like other parts of the ceiling that have detached." (Italics added.) The 30-day Notice then displays five photographs which identify "[t]he parts of the ceiling that must be repaired."

On the matter of insurance, the trial court found: "[the Landords] failed [their] burden of showing that defendants neglected to provide the insurance called for by the lease. . . . Exhibit 140 is a certificate of insurance issued by the defendants' broker dated 10/24/16 showing the appropriate coverages (even exceeding the limits called for in the lease) for the policy period from 9/3/16 through 9/3/17 listing all three plaintiff owners as additional insureds. The original lease . . . states that providing a certificate of insurance is an acceptable manner of assuring the landlord that insurance was acquired. In addition, the actual policy for this period of time . . . does contain an additional insured endorsement entitled 'Additional Insured Managers or Lessors of Premises.' While it is true that the data field on the additional insured endorsement only states 'Goldenwest Plaza c/o Essex Rea (sic) 18012 Sky Park Circle Ste 200,' the broker, Tom Chau, testified that the data field on the additional insured endorsement only allows a limited number of characters to be displayed and that all three own [sic] entities were in fact listed as additional insureds. There were other certificates of insurance and actual policies all of which, taken together tend to show that insurance was in place as required by the policy."

2. *Substantial Evidence Supports the Trial Court's Findings*

The Landlords argue substantial evidence does not support the trial court's findings because the insurance policies in effect in October 2016 named "Lily Brie, *Corp*." as an insured, there had never been a "Lily Brie, *Corp*.," and Summer Z, not Lily Brie *Corp*., was the approved tenant. For that reason, the Landlords argue, for the years 2014, 2015, and, as of October 2016, there were no insurance policies in place naming Summer Z as an insured and the Landlords as additional insureds. In addition, the Landlords argue the evidence established they were not named as additional insureds to the public liability policy.

We conclude substantial evidence supports the trial court's finding Defendants were in compliance with the insurance provision of the Lease. The policies

23

covering the period September 23, 2013 through September 23, 2017 named Lily Brie Corp. and Sunny's as the insureds. The policies covering the period September 23, 2015 through September 23, 2017 had endorsements naming Goldenwest as an additional insured and included a building owners endorsement to make sure the Restaurant Building was protected by the policy. The certificate of liability insurance for the policy period September 23, 2016 through September 23, 2017, identified the insured as Lily Brie Corp. DBA Sunny's Restaurant and the certificate holder as Goldenwest Plaza, and named each of the Landlords as an additional insured. The property manager had received this certificate of insurance by December 5, 2016.

The property manager notified Shado Zervos and Summer Zervos by e-mail dated December 5, 2016 that they would have to provide a revised certificate of insurance naming Summer Z and Shado Zervos as the insureds and an endorsement naming the Landlords and property management company as additional insureds. On December 8, 2016, Defendants' attorney confirmed the insurance company had provided insurance to protect the building and its contents and the premiums had been paid, and provided the Landlords' attorney a copy of the policy. The policy (trial exhibit No. 351) had an endorsement, "Additional Insured – Managers or Lessors of Premises," naming "Goldenwest Plaza c/o Essex Rea" as an additional insured. (Some capitalization omitted.) The policy also had a building owners endorsement which meant the Restaurant Building was protected by the policy. A businessowners policy declaration endorsement with an effective date of December 13, 2016 (trial exhibit No. 224) names the insured as "Lily Brie Corp/Summer Z Corp."

On January 9, 2017, Defendants obtained an endorsement from the insurer naming as additional insureds Goldenwest, the Doyle Foundation, and Busby Family. The policies covering the period September 23, 2017 through September 23, 2019 named the Doyle Foundation and Goldenwest as additional insureds.

24

### 3. *Defendants Were at Least in Substantial Compliance with the Insurance Provision*

Defendants, if not in strict compliance, were materially and substantially in compliance with the insurance provision of the Lease. A breach of a lease covenant must be material in order to justify forfeiture and termination of the lease. (*Boston LLC v. Juarez* (2016) 245 Cal.App.4th 75, 83.) "The law sensibly recognizes that although every instance of noncompliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated. [Citations.] Following the lead of the Restatements of Contracts, California courts allow termination only if the breach can be classified as 'material,' 'substantial,' or 'total.'" (*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1051.) "This is especially true when the breach involves a nonmonetary covenant in the lease." (10 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 34:181, p. 34-578.) Whether a breach of a contract is material is a question of fact reviewed for substantial evidence. (See *Porter v. Arthur Murray, Inc.* (1967) 249 Cal.App.2d 410, 423; *Ass. Lathing etc. Co. v. Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 51.)

The trial court did not make a finding of substantial breach; however, the Landlords did not bring this omission to the trial court's attention or object to the proposed statement of decision on that ground. The Landlords objected to the proposed statement of decision on the ground it omitted a finding on whether Defendants had failed to provide insurance required by Lease paragraph 36.A and whether such failure to provide insurance was "curable" within the meaning of Lease paragraph 7. The trial court did not make a finding on whether the failure to provide insurance was curable, but that is not the same issue as whether such failure to comply was material or substantial. We therefore invoke the doctrine of implied findings to infer the trial court made implied findings favorable to Defendants on the issue of materiality of any breach of the Lease's insurance provision. (*Fladeboe, supra*, 150 Cal.App.4th at pp. 59-60.)

25

Any breach of the Lease's insurance requirements was insubstantial because the evidence showed, as of December 13, 2016, Summer Z and each of the Landlords had been named as additional insureds. The Restaurant Building was and had always been insured. Although the endorsement specifically naming the Landlords as additional insureds was not issued until January 9, 2017, that was only a few days after the 30-day cure period of the 30-Day Notice had elapsed. The Landlords presented no evidence of harm from this brief delay. The insurer treated the Landlords as insureds under the policy: The insurer denied the Landlords claim based on a policy exclusion, not on the ground they were not insureds.

The 30-day Notice was served on December 6, 2016, during the insurance coverage period of September 23, 2016 to September 23, 2017. Any defects in the policies in effect before September 23, 2016 were immaterial or insubstantial because no evidence was presented of any claims or potential claims the Landlords had or might have had during those previous policy periods. The 30-day Notice did not-and could not-encompass policies covering periods after September 23, 2017 and, besides, polices with coverage periods after that date named Summer Z and the Landlords as additional insureds.

C. *No Breach of the Maintenance and Repair Provision or Compliance with Laws Provision of the Lease*

1. *Lease Provisions and the Trial Court's Findings*

Paragraph 21 of the Lease required Defendants to "comply with all of the requirements of all Municipal, County, State, and Federal authorities now in force." Lease paragraph 11 enjoins Defendants from committing waste or allowing anything to be done on the premises that violates any law. Lease paragraph 35 requires Defendants to "at its sole cost, keep and maintain said premises and appurtenances and every part thereof, including the exterior walls structure, glass and roof, in good and sanitary order, condition, and repair."

The Landlords contend the trial court erred by finding Defendants did not breach those provisions of the Lease. The Landlords argue the evidence at trial established Defendants were not in compliance with various provisions of the California Retail Food Code, Health and Safety Code section 113700 et seq.

The trial court found: "With respect to the second general category listed in the 30[-]day notice, repair of interior ceilings and walls, the court also finds that plaintiff did not meet its burden of showing that defendants failed to make the necessary repairs thereto. The evidence established that defendants hired Harbor Environmental to remove and replace damaged drywall throughout portions of the restaurant. While there are literally hundreds of photographs in evidence showing the interior of the restaurant in various stages of disrepair after the October 2016 rainfall, there was no testimony or other evidence showing that repairs to the interiors were not completed in a timely manner. Witness Adela Miller of Harbor Environmental testified that her company was hired to do the repair work (Exhibit 206) and commenced work around December 12 or 13 of 2016. While it is reasonable to assume the work was completed by early January of 2017 there was no testimony pinpointing when their work was actually completed."

2. *No Implied Findings*

The Landlords filed lengthy objections to the proposed statement of decision, of which objection Nos. 1, 2, and 7 pertained to the maintenance and repair and compliance with laws provision of the Lease. In objection No. 1, the Landlords asserted the statement of decision did not mention Health and Safety Code section 114257, which states, "[a]ll premises of a food facility shall be kept clean [and] fully operative, and in good repair." The Landlords objected to the statement of decision on the ground it did not make findings on the issues of whether Defendants were in violation of various

27

provisions of the California Retail Food Code and whether Defendants caused eight identified categories of damage to the Restaurant Building.[9]

In objection No. 2, the Landlords asserted the statement of decision did not address their request for a factual and legal explanation about whether repairs were possible or whether the eight categories of damages claimed to have been caused by Defendants were repairable. In objection No. 7, the Landlords asserted the statement of decision did not address their requests for a decision on 14 issues concerning breach of the Lease; whether Defendants remedied certain damages to and conditions of the kitchen, roof, walls, vents, and ducts; and whether Defendants "'caused or allowed and failed to fix, remedy and repair'" such damages and conditions.

By posing objections to the proposed statement of decision and apprising the trial court of omissions in it, the Landlords have avoided the doctrine of implied findings on issues relating to whether Defendants breached the maintenance and repair and compliance with laws provisions of the Lease. (*Fladeboe, supra*, 150 Cal.App.4th at p. 59.) We therefore do not infer the trial court made implied findings on those issues. (*Furry v. East Bay Publishing, LLC* (2018) 30 Cal.App.5th 1072, 1084.)

3. *Sufficiency of the Trial Court's Express Findings*

The question then is whether the trial court's express findings are sufficient to uphold the judgment. "'"It is essential that, unless they are waived, findings be made on every material issue raised by the pleadings and the evidence, whether those issues are raised by denial of the allegations of the complaint or cross-complaint, or on affirmative defenses set up in the answer or cross-complaint."'" (*Furry v. East Bay Publishing, LLC, supra*, 30 Cal.App.5th at p. 1084.)

---

[9] In the request for statement of decision, the Landlords identified eight categories of damage: (1) "Kitchen Plywood Decay and Roof Rafter Damage Condition," (2) "Kitchen Roof Drain Bay Area Damage Condition," (3) "Kitchen Lobby Wall Roof Damage Condition," (4) "Roof Surface Damage Condition," (5) "Grease Vent Damage Condition," (6) "Pony Wall Damage Condition," (7) "Kitchen Ceiling Damage Condition," and (8) "Air Duct Damage Condition."

28

"Sections 632 and 634 of the Code of Civil Procedure have been interpreted to mean a statement of decision is adequate if it fairly discloses [the trial court's] determinations as to the ultimate facts and material issues in the case." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.) The term "ultimate facts" refers to core facts, "such as an essential element of a claim" and are different from evidentiary facts and legal conclusions. (*Ibid.*) A trial court is required neither to respond to each and every issue posed in a request for statement of decision nor to make findings "with regard to 'detailed evidentiary facts or to make minute findings as to individual items of evidence.'" (*Thompson v. Asimos, supra*, 6 Cal.App.5th at p. 983.)

The trial court did not make detailed findings on the issue of breach of the maintenance and repair and compliance with laws provisions of the Lease. The court found, "[w]ith respect to the second general category listed in the 30[-]day notice," (1) the Landlords did not meet their burden of showing "[D]efendants failed to make the necessary repairs," (2) no evidence was presented to show the repairs were not completed in a timely manner, and (3) "it [was] reasonable to assume" Harbor completed its work by early January 2017.

The trial court's findings, though barebones, suffice. The court first identified the second general category of defaults set forth in the 30-day Notice, which encompasses the damage to the interior walls and ceilings of the Restaurant Building, then the court found Landlords had failed to prove Defendants did not make all of necessary repairs. Earlier in the statement of decision, the court found "[r]epair to the ceilings was done." The court did not cite to any provision of the California Retail Food Code; however, the court referred to the second category of the 30-day Notice, and it cited the relevant code provisions. The court's finding thereby of necessity, not implication, resolved the issue whether Defendants had made repairs necessary to bring the Restaurant Building in compliance with the California Retail Food Code. The trial court, in a single broadly-worded finding, instead of dozens of minute findings, resolved

29

all the issues regarding the maintenance and repair and compliance with laws obligations identified in the 30-day Notice.

    4. *The Evidence Does Not Compel Findings in the Landlords' Favor*

The trial court's findings, though sufficient to disclose the court's determination as to ultimate facts and material issues, are still subject to review under the substantial evidence test, and the trial court's legal conclusions are subject to de novo review. When, as in this case, the trier of fact has expressly concluded the appellant had the burden of proof and did not carry that burden, "'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466 (*Sonic*); see *Eisen v. Tavangarian* (2019) 36 Cal.App.5th 626, 647 [same]; *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 769 [same].) Reversal is warranted only if "'the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Sonic, supra*, at p. 466.) This is "an onerous standard." (*Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 164.)

The evidence showed that in early December 2016, Summer Zervos engaged Harbor to demolish, remove, and replace drywall and ceiling systems in the kitchen, dry storage room, and dishwashing area. Adela Miller testified Harbor subcontracted with Prime Waterproofing to fix the ceiling leaks. Harbor completed the work it was hired to do by early January 2017. Harbor removed the damaged drywall and installed new drywall in the kitchen, dry storage room, and dishwashing area, and placed plastic under the ceilings to prevent water from leaking into the Restaurant Building. Prime Waterproofing completed its job.

The Landlords offered contrary evidence-in particular, Doyle's testimony regarding the black hole. Although OCHCA inspections in July, August, September, and

December 2017 noted problems with the ceiling, Sunny's passed inspections conducted on December 27, 2017, January 3, July 30, and December 18, 2018, and July 11 and November 25, 2019. The evidence at trial did not compel a finding in favor of the Landlords as a matter of law.

### 5. *The Dangerous Condition Finding*

The trial court found "the center portion of the roof is a dangerous condition" and "subject[s] tenants and the premises to the potential for further water damage." The court concluded the Landlords had the obligation to remediate the dangerous condition and therefore had the duty to replace the roof.

The Landlords contend the trial court's dangerous condition finding is in fact favorable to them and ipso facto requires reversal of the judgment. This is a central theme of their appeal. The Landlords present two reasons why the dangerous condition finding is favorable to them. First, the Landlords argue, the dangerous condition was attributable to Defendants, who had the contractual obligation to keep the Restaurant Building in good repair and to comply with health and safety statutes. Thus, the Landlords argue, the dangerous condition finding would support imposing on Defendants the responsibility to pay for the roofing work or for replacing the roof.

But the finding that the center portion of the roof is a dangerous condition does not conflict with the finding that the Landlords failed to prove the elements of their breach of contract claims. Those claims, as limited by the 30-day Notice, did not include the condition of the roof. We conclude in part V.B.3 of the Discussion section the Landlords' potential liability to third parties for a dangerous condition at the Restaurant Building does not mean the Landlords could be compelled by mandatory injunction to remediate the condition.

Second, the Landlords argue the trial court's dangerous condition finding helps them by contradicting and negating the court's findings that the Landlords did not meet their burden of proving the elements of negligence, nuisance, and waste. The

31

Landlords apparently argue the contradiction arises, because Defendants caused the dangerous condition and had the duty to remediate it, and, therefore, implicit in the dangerous condition finding are findings that Defendants owed and breached tort duties owed to the Landlords. We address this supposed contradiction in part III of the Discussion section. We find no contradiction.

D. *Failure to Have a Functioning Makeup Air Unit*

The 30-day Notice cites Defendants for failing to have a functioning makeup air unit on the Restaurant Building. Under the heading "Mechanical Code Violations," the 30-day Notice states: "You shall arrange for the procurement and installation of makeup air equipment as required by and in accordance with the California Mechanical Code."[10]

The California Retail Food Code provides, "Makeup air shall be provided at the rate of that exhausted." (Health & Saf. Code, § 114149.1, subd. (d).) Section 114149.1, which addresses mechanical exhaust ventilation equipment, states in subdivision (a), "[m]echanical exhaust ventilation equipment shall be provided over all cooking equipment as required to effectively remove cooking odors, smoke, steam, grease, heat, and vapors."

The California Retail Food Code was enacted in 2006 and became effective on July 1, 2007. (Stats. 2006, ch. 23, § 1.) The trial court concluded the Restaurant Building was not subject to Health and Safety Code section 114149.1 because the building was constructed before July 1, 2007: "The structure at issue was constructed in 1979 and has been continuously operated as a restaurant to the present time apparently without a make-up air unit. There was no evidence that any enforcing agency ever found

_____

[10] The lack of a makeup air unit was a reason cited by the 30-day Notice for the rat infestation: "You have also permitted rats to nest in the ceilings of the restaurant. Because you leave the back door open as an illegal means of allowing air from the outside to replace the air that is exhausted to the roof from the exhaust fans and because you have left the conditions of parts of the ceiling to remain open, you have violated the provisions of [Health and Safety Code] sections 113984(c), 114047(b), 114259 and 114259.1. You must cease leaving the back door open."

32

that lack of a make-up air unit posed a public health hazard.  To the contrary, defendants offered evidence that they are in possession of all necessary permits to operate a restaurant including county fire and health permits."

The trial court legally erred.  The court relied on Health and Safety Code section 114380, subdivision (d) (section 114380(d)) which reads:  "Except when a determination is made by the enforcement agency that the nonconforming structural conditions pose a public health hazard, *existing food facilities that were in compliance with the law in effect on June 30, 2007, shall be deemed to be in compliance with the law pending replacement or renovation*.  If a determination is made by the enforcement agency that a structural condition poses a public health hazard, the food facility shall remedy the deficiency to the satisfaction of the enforcement agency."  (Italics added.)

The trial court concluded, and Defendants contend, the italicized language means that because makeup air units were not required by the law in effect on June 30, 2007, Defendants are deemed to be in compliance with the law notwithstanding the lack of a functioning makeup air unit at the Restaurant Building.  Defendants never received a citation from any governmental agency regarding a failure to maintain or have make-up air equipment and so, they contend, they are deemed to be in compliance with section 114380(d).

But section 114380(d) refers only to structural conditions at a retail food facility, not all conditions.  Health and Safety Code section 114380 addresses plans and specifications for building or remodeling a food facility:  "A person proposing to build or remodel a food facility shall submit complete, easily readable plans drawn to scale, and specifications to the enforcement agency for review, and shall receive plan approval before starting any new construction or remodeling of a facility for use as a retail food facility."  (*Id*., § 114380, subd. (a).)  Section 114380(d) refers to "nonconforming *structural* conditions."  (Italics added.)  Viewed in such context, section 114380(d) cannot plausibly be read to mean that if a food facility were in compliance with the law in

33

effect on June 30, 2007, then the food facility would be deemed to be in compliance with the entire California Retail Food Code unless and until a contrary determination is made by an enforcement agency.

Section 114380(d) might encompass a makeup air unit if it is considered to be a structural condition. The evidence at trial established, however, that a makeup air unit is not structural but is equipment, similar to ventilation or air conditioning, that is attached to, and can be removed from, an existing structure. Because a makeup air unit is not structural, it does not fall within section 114380(d). Therefore, a determination by an enforcement agency was not a prerequisite for finding Defendants were not in compliance with the law requiring a functioning makeup air unit on the Restaurant Building.

Defendants, not the Landlords, had the obligation under the Lease to comply with all laws and therefore were responsible for ensuring the Restaurant Building had a functioning makeup air unit. At this point, a digression is necessary to address the dispute between the litigants over which side "owned" the Roof Equipment (which would include the nonfunctional swamp cooler/makeup air unit). Each side has taken the position and continues to argue the other "owned" the Roof Equipment and, therefore, had the obligation to maintain it and remove it to permit completion of the roofing work.

Arguing over which party owned the Roof Equipment misses the relevant issue: Under fundamental landlord tenant law, the issue is what *interests* did the Landlords and Defendants have in the Roof Equipment. The trial court's conclusion the Roof Equipment is "the [L]andlords property" is not so much wrong as it is incomplete. Both the Landlords and Defendants "owned" the Roof Equipment. Defendants owned a present possessory interest in the Roof Equipment because it was part of the premises demised to them. (*Avalon Pacific – Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1190 (*Avalon Pacific*).) The Landlords owned a

34

future reversionary interest in the Roof Equipment and retained fee title to the entire premises. (*Ibid.*)

It does not matter who, if anybody, installed or used the Roof Equipment: Because it was part of the premises leased to Defendants, they hold the present possessory interest and the Landlords hold the reversionary interest and fee title. The respective rights and obligations regarding the Roof Equipment are allocated by the landlord/tenant relationship, based on the terms of the Lease and privity of estate. (*Avalon Pacific, supra*, 192 Cal.App.4th at p. 1190.)

The Lease allocated to Defendants the obligation to comply with all laws and to keep the leased premises in good condition, order, and repair. Defendants therefore had the obligation to maintain and repair the Roof Equipment and keep it in good condition and to maintain a functioning makeup air unit in compliance with the California Retail Food Code. (*Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 671 (*Sewell*).) A covenant to comply with all laws does not, standing alone, require "curative actions of a 'substantial' nature" (*id.* at p. 674); however, maintaining a functioning makeup air system, which is not structural, is not substantial in nature.[11]

The Restaurant Building either did not have a makeup air unit or the makeup air unit was not functioning as of November 2016.[12] Because the Restaurant Building did not have a functioning makeup air unit, Defendants were in breach of the compliance with laws provision of the Lease. A breach of a lease covenant must be material in order to justify forfeiture and termination of the lease. (*Boston LLC v. Juarez,*

---

[11]     Pacific Coast Refrigeration and Air Conditioning, Inc. (Pacific Coast), submitted a bid to demolish and remove the existing main kitchen makeup air unit for $4,200 and to install a new unit (sheet metal, electrical, and controls included) for $8,200.

[12]     The evidence on this point is unclear. Exhibit No. 172, the bid proposal from Pacific Coast, includes within the scope of work "demo" and "[r]eplacement of existing Main Kitchen Make-Up air unit." This makeup air unit was not operating at the time. Other evidence was the Restaurant Building did not have a makeup air unit but had a swamp cooler supposedly serving as one. The swamp cooler was not operational. In either case, the Restaurant Building did not have a functioning makeup air unit as of the date of service of the 30-day Notice.

*supra*, 245 Cal.App.4th at pp. 79, 83.)  Following remand, the trial court shall conduct proceedings to determine whether Defendants' breach of the compliance with laws provision was sufficiently material to justify lease termination.

E.  *Notices of Default*

The Landlords contend Defendants breached and repudiated the Lease by service of their three notices of default because those notices were an "attempt to shift responsibility for the damages to the Restaurant Building from their shoulders to the shoulders of the Landlords by . . . artifice."

An express repudiation of a contract is "a clear, positive, unequivocal refusal to perform" and an implied repudiation is "conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible." (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 137.)  Defendants' notices are neither an express nor implied repudiation of the Lease.  Paragraph 58 of the Lease gives the tenant the right and ability to serve notices of default on the Landlord.  Exercising a right granted by the Lease is not a repudiation of it.  The notices made claims regarding the Landlords' obligations under the Lease; the Landlords have disputed those claims.  Each side has interpreted the Lease differently.  Defendants did not refuse to perform but claimed they did not have the obligation to perform.  A dispute over the meaning of a lease does not mean one of the disputants has repudiated it.

### III.  The Landlords' Negligence, Nuisance, and Waste Causes of Action

A.  *Sufficiency of the Trial Court's Findings*

The trial court found in favor of Defendants on the Landlords' causes of action for negligence, private and public nuisance, and waste "[f]or the same reasons" for which the court found in favor of Defendants on the Landlords' breach of contract cause of action.  The Landlords argue the phrase "[f]or the same reasons" is ambiguous and that finding is legally erroneous because "it was not necessary for the [Landlords] to establish

36

a breach of contract to establish a negligence, nuisance, or waste claim." The Landlords refer to "13 factors" which, they argue, "contradict, refute and disprove the trial court's statement."[13] The Landlords objected to the trial court's findings on the negligence, nuisance, and waste causes of action on the ground the term "[f]or the same reasons" is a deficient explanation of the factual and legal basis for the court's decision.[14]

The trial court did not limit the basis for its decision to the "[f]or the same reasons" statement: The court also expressly found the Landlords had failed to meet their burden of proving the elements of negligence, public and private nuisance, and waste. Those findings, like others in the statement of decision, are barebones, but they are sufficient: It is enough that the court made findings as to each essential element of the claims for negligence, nuisance, and waste. (*Central Valley General Hospital v. Smith, supra*, 162 Cal.App.4th at p. 513.) The trial court was not required to respond to the dozens of findings proposed by the Landlords.

B. *The Dangerous Condition Finding Does Not Contradict the Findings on the Negligence, Nuisance, and Waste Causes of Action*

Because the trial court found the Landlords had failed to meet their burden of proving each of the elements of the causes of action for negligence, nuisance, and waste, reversal is warranted only if the evidence at trial compelled findings in favor of the Landlords as a matter of law. (*Sonic, supra*, 196 Cal.App.4th at pp. 465-466.) The

---

[13] The Landlords had recited those 13 factors to show the trial court's findings on their breach of contract cause of action were erroneous. Most of those 13 factors either were unrelated to the negligence, nuisance, or waste causes action or were resolved by the trial court's findings on the Landlords' breach of contract cause of action. Several of the 13 factors—those relating to the roof condition, the dangerous condition finding, and the Roof Equipment—are pertinent to the negligence, nuisance, and waste causes of action but were not encompassed by the Landlords' breach of contract action due to the scope of the 30-day Notice.

[14] The trial court's reasons for finding in Defendants' favor on the Landlords' breach of contract cause of action would not completely resolve the Landlords' negligence, nuisance, and waste causes of action. The trial court's decision on the Landlords' breach of contract was limited to the three categories of alleged Lease violations charged in the 30-day Notice. However, the Landlord's causes of action for negligence, nuisance, and waste were not limited by the 30-day Notice because notice under paragraph 7 of the Lease applies only to failure to perform a "covenant, condition, or agreement" under the Lease other than payment of rent. The negligence, nuisance, and waste causes of action included claims against Defendant over the condition of the roof and the Roof Equipment.

Landlords do not attempt to show the evidence compelled findings in their favor; instead, they argue "[t]he dangerous conditions finding . . . contradicts the basis for the trial court's statement about the negligence, nuisance and waste claims and cannot be reconciled with it." The Landlords' argument is focused on the element of duty: They argue a question of duty is reviewed de novo and we should find Defendants had tort duties of care and duties to keep the Restaurant Building free of conditions that qualify as nuisance or waste.

Duty is not an issue: There can be no dispute Defendants owed the Landlords duties under the Lease and under tort law not to act negligently with respect to the Restaurant Building, not to create a nuisance, and not to commit waste. The cause of the dangerous condition is the issue. The finding that the center portion of the roof is a dangerous condition does not conflict with the trial court's findings because the dangerous condition finding was not a determination of the *cause* of the condition. To prevail on their tort claims on appeal, the Landlords must identify evidence at trial that would compel a finding in their favor that Defendants' conduct was the proximate cause of damage to the Landlords (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917 [negligence]), caused the Landlords to suffer substantial damage to the use and enjoyment of their property (*Mendez v. Rancho Valencia Resort Partners, LLC* (2016) 3 Cal.App.5th 248, 262-263 [private nuisance]), created a "substantial and unreasonable interference with a public right" (*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 79 [public nuisance]), or caused injury to the Landlords' reversion interest "'substantially depreciating the market value of the property'" (*Avalon Pacific, supra*, 192 Cal.App.4th at p. 1214 [waste]).

The evidence at trial did not compel a finding as a matter of law that the condition of the roof was attributable to Defendants. Evidence was presented from which a reasonable inference could be drawn that the condition of the roof was due to its age. While there was evidence the Landlords did not properly maintain the roof, Summer

38

Zervos testified to the contrary,[15] and there also was evidence showing the condition of the roof was a consequence of its age. The roof was constructed in 1979 and had a useful life of, at best, 20 to 25 years. By 2016 the roof was 37 years old – at least 12 years past its useful life. In 2015, the Landlords obtained estimates for the replacement of the roof, and a report from an insurance company inspector noted the age of the Restaurant Building and "the lack of recent upgrading" as a potential cause of the roof leaks. The trial court expressly found, "[t]he [L]andlords had four (4) roof reports in their possession establishing the roof on the building was beyond repair and required replacement." The condition of the ductwork, likewise, could be attributable to age rather than care and maintenance.

Given the age of the roof and evidence the Landlords had sought bids to replace it, the trial court could reject the testimony of the Landlords' expert witness that condition of the roof was due to poor maintenance and repair. (*Howard v. Owens Corning, supra*, 72 Cal.App.4th at po. 631-632 [trial court may reject even uncontradicted expert testimony if the court does not do so arbitrarily]; see *In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 820 ["the fact the expert's testimony was not contradicted by other expert testimony does not make it conclusive on the trial court or on us"].)

C. *The Trial Court's Additional Findings on Public Nuisance and Waste*

In addition, as to public nuisance, the trial court found the Landlords had failed to prove Defendant "knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right." "A public nuisance cause of action is

---

[15] Harris, the Landlords' roofing expert, concluded the roof had been poorly maintained and repaired over the years, and the poor maintenance and repairs caused damage to the roof rafters and plywood areas of the roof. Summer Zervos testified she had a company called Flue Steam empty the grease traps, clean the interior hoods, and steam clean the roof on a quarterly basis. She testified that once a month, the roof would be inspected, debris removed, drains cleared, and repairs made as needed, and the ducts on the roof were professionally cleaned on a quarterly basis. She also testified that since the remodel of the Restaurant Building and the Shopping Center began, grease traps had been removed from the roof.

established by proof that a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right." (*People v. ConAgra Grocery Products Co., supra*, 17 Cal.App.5th at p. 79.) A public nuisance is one that affects "'an entire community or neighborhood, or any considerable number of persons.'" (*Rincon Band of Luiseño Mission Indians etc. v. Flynt* (2021) 70 Cal.App.5th 1059, 1100.)

On appeal, the Landlords do not identify what public right was at stake, how Defendants did anything to interfere with that public right, or how-in this case, the conditions of the Restaurant Building affected an entire community, neighborhood, or considerable number of people.

As to waste, the trial court found the Landlords had failed to prove Defendants' actions substantially or permanently diminished the value of the property. "The gist of a waste claim is acts by the tenant causing injury to the lessor's reversion interest or the inheritance. 'To constitute waste, there must be an injury to the inheritance [citation], substantially depreciating the market value of the property.'" (*Avalon Pacific, supra*, 192 Cal.App.4th at p. 1214.) Some cases have required proof of diminution of the property's market value to recover for waste, other cases have required evidence of permanent diminution of the property's value. (*Ibid*.) A claim of waste cannot be based on "remediable damage which, though 'substantial' on a subjective level, causes no proven injury to the reversion interest." (*Id*. at p. 1216.)

The record supports the trial court's finding. The Landlords did not offer any proof of diminution in value of the Restaurant Building or of irremediable injury. The Landlords' position has been the damage which they claim constitutes waste was entirely remediable. Indeed, the Landlords state in their opening brief the roof conditions "were repairable" and "were not impossible to repair." The trial court got it right,

40

D. *The Violations of the California Retail Food Code Do Not Establish Negligence Per Se*

The Landlords argue Defendants' violations of the California Retail Food Code constitute negligence per se. Under the negligence per se doctrine, codified in Evidence Code section 669, "'a violation of a statute gives rise to a presumption of negligence in the absence of justification or excuse'" if the person who suffered the injury "'was one of the class of persons for whose protection the statute . . . was adopted'" and the harm was one the statute was designed to prevent. (*Ramirez v. Nelson* (2008) 44 Cal.4th 908, 918.)

The class of persons for whom the California Retail Food Code was adopted is, according to the Landlords, "those who are employed at a restaurant and those who patronize restaurants." In this lawsuit, the Landlords are not acting in their role of restaurant patrons. The stated purpose of the California Retail Food Code is to provide to consumers "food that is safe, unadulterated, and honestly presented through adoption of science-based standards." (Health & Saf. Code, § 113703.) The Landlords are not claiming they suffered harm in the form of unsafe, adulterated, or dishonestly presented food. This is a bridge too far.

## IV. The Landlords' Ejectment Cause of Action and Summer Z's Option to Renew the Lease

The 2009 Amendment and Assignment granted Summer Z two options to extend the Lease for two additional five-year terms, "provided that Tenant is not in default under the Lease at the time of such exercise." In May 2018, Summer Z served the Landlords with notice it was exercising the first option. The Landlords contended Summer Z could not exercise this option because the Lease had been terminated.

The Landlords contend the Lease term has ended and Summer Z did not have the right to exercise the option to extend the Lease term because Summer Z was in default of the Lease by, among other things, failing to maintain the roof and the Roof Equipment, procure and maintain insurance, and comply with laws such as the California

Retail Food Code. We have concluded Defendants were in breach of the Lease in one respect: They failed to maintain a functioning makeup air unit at the Restaurant Building. If this breach is material-an issue to be determined after remand-then the trial court should address whether Summer Z's option to extend the Lease was effective.

The Landlords state Defendants' decision to vacate the Restaurant Building "appears" to have rendered the ejectment cause of action moot. But no admissible evidence has been presented to us to establish Defendants have, in fact, vacated the Restaurant Building, and Defendants have not filed a motion to dismiss the appeal of the ejectment cause of action as moot.

## V. Injunction to Complete Reroofing of the Restaurant Building

A. *Grounds Cited by the Trial Court for Authorizing Injunctive Relief*

The trial court granted Summer Z relief on its cross-complaint by issuing a mandatory injunction requiring the Landlords "to complete the re-roofing" at the Restaurant Building and to remove and replace the Roof Equipment at the Landlords' expense. The trial court did not identify any express Lease provision placing on the Landlords the duty to finish the roofing work or replace the roof. Defendants have never identified any express provision of the Lease imposing such a duty on the Landlords; in fact, in closing argument, Defendants' counsel conceded the Lease "doesn't have any language requiring [the Landlords] to replace" the roof. We are constrained to agree.

Rather than rely upon an express provision of the Lease, the trial court concluded injunctive relief was authorized and warranted under several theories not tied to any express Lease provision or even to the Lease itself. First, the court found the parties had, in effect, made an oral contract: "[T]he landlords *undertook* to replace the roofs on all buildings in the shopping center at the time of the remodel project. [Citations.] All of the work was completed except for the center portion of the roof on tenants' building. [Citation]. The reason this portion of the roof was left uncompleted is

42

because landlords insisted that tenants pay for the removal and replacement of all equipment on the roof including extensive ducting, vents, HVAC equipment, an abandoned swamp cooler, and various items of debris. . . . It is important to note that nothing in the lease gave landlords the right to remodel the Premises. Defendants went along with the remodel project believing that they would get a new roof. (See Exhibit 84). This appears to be the quid pro quo."

Second, the trial court found the center portion of the roof to be a dangerous condition which the Landlords had an obligation to correct: "The landlords, and not the tenants, have a duty to replace the center portion to correct it since the evidence established that the landlords have actual knowledge of the condition, and the right [citation] and the financial ability to correct it."

Third and fourth, the trial court found injunctive relief was warranted under theories of promissory estoppel and breach of the implied covenant of good faith and fair dealing: "The court also finds that since the landlords undertook to replace the roof on the building, the landlords are obligated to complete the work based on promissory estoppel and/or the implied covenant of good faith and fair dealing."

The Landlords challenge each of the grounds on which the trial court based the mandatory injunction. In addition, the Landlords argue the Lease did not impose on them the duty to complete the roofing work or replace the roof. We do not reach the Landlords' arguments the mandatory injunction is too uncertain to be enforceable and the Lease expired on May 31, 2019.

B. *The Injunctive Relief Granted Could Not Be Based on Any of the Grounds Cited by the Trial Court*

    1. *Injunctive Relief Must Be Based on the Lease*

We first address each of the grounds on which the trial court based the mandatory injunction and the closely related issue of whether Defendants pleaded a cause of action for which relief could be granted in the form of a mandatory injunction. In the

43

cross-complaint, Summer Z asserted two causes of action: breach of written lease and declaratory relief. Summer Z did not allege Landlords had committed a tort, such as nuisance, that might support a mandatory injunction.

The Lease says it can be enforced by suit for damages or injunction. Paragraph 58 of the Lease states: "In no event shall Tenant have the right to terminate this Lease as a result of Landlord's default and Tenant's remedies shall be limited to damages and/or an injunction." In the cross-complaint's prayer for relief, Defendants asked for "injunctive relief ordering Landlord to specifically perform its obligations under *the Lease* as set forth in this cross-complaint." (Italics added.) A mandatory injunction in effect is the same thing as specific performance, which is an appropriate means of enforcing obligations under a lease. (*Avalon Pacific, supra*, 192 Cal.App.4th at pp. 1201-1202, 1209.) However, for Defendants to be entitled to specific performance/mandatory injunction, they would have to prove the Landlords were in breach of the Lease for failing to complete the roofing work; that is, the obligation to undertake the roofing work or replace the roof must have arisen under the Lease.

2. *Substantial Evidence Does Not Support a Finding of a "Quid pro Quo"*

The trial court found the Landlords had an obligation to complete the roofing work on the Restaurant Building under the terms of an oral contract; that is, Defendants agreed to allow the Landlords to remodel the Restaurant Building in exchange for receiving "a new roof" – the "quid pro quo." But this quid pro quo agreement was not part of the Lease, and Summer Z did not sue for breach of any agreement or contract other than the Lease. Summer Z's cross-complaint does not mention any such agreement or quid pro quo.

We cannot find substantial evidence to support the court's finding of some sort of quid pro quo agreement. In the statement of decision, the trial court cited exhibit No. 84, which is an e-mail from the property manager to Shado Zervos notifying him of the need to correct seven items, "[w]ith the exception of a new roof," within 90 days.

44

The e-mail says nothing about replacing the roof in exchange for permission to remodel the Restaurant Building.

Indeed, Andrew Zervos testified contrary to the notion of a quid pro quo. In his deposition, received into evidence at trial as exhibit No. 347, he testified the property manager had told him the Shopping Center was going to be remodeled, the roofs were going to be replaced, *the tenant* was responsible for the cost of replacing the roof on the Restaurant Building, and his portion of the cost would be $40,000. That contradicts the trial court's surmised quid pro quo.

3. *A Landlord's Tort Duty of Care to Third Parties Does Not Authorize Injunctive Relief*

The trial court, citing CACI No. 1006, found the Landlords had a duty "to replace" the center area of the roof because they knew damage to the roof had created a dangerous condition on the property. CACI No. 1006 instructs on a landlord's duty of care when a third party has been injured due to an unsafe condition on leased property. The directions for use state CACI No. 1006 should be given with CACI Nos. 1000, 1001, and 1003, all of which concern a third-party plaintiff's tort claim for injury based on the way in which property was maintained.

Summer Z did not assert a cause of action based on a landlord's duty of care to third parties. Moreover, the only duty imposed on a landlord by the principle of law set forth in CACI No. 1006 is a duty of care to the general public to take reasonable precautions to prevent injury due to any unsafe condition on the premises of which the landlord has actual knowledge. (See *Salinas v. Martin* (2008) 166 Cal.App.4th 404, 412.) If a landlord has the right and ability to cure the dangerous condition, then breach of that duty of care could render the landlord liable to a third party for damages for injuries suffered. (*Day v. Lupo Vine Street L.P.* (2018) 22 Cal.App.5th 62, 69.) Although the threat of damages might be an incentive for a landlord to remediate any

unsafe condition, the duty of care does not affirmatively impose an obligation of remediation that can be enforced by a mandatory injunction.

4. *Summer Z Did Not Plead Promissory Estoppel as a Basis for Affirmative Relief*

The trial court concluded, based on promissory estoppel, the Landlords, having begun the roofing work, were obligated to complete it. The party claiming promissory estoppel must plead all facts relied on to establish its elements. (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1155; *Michaelian v. State Comp. Ins. Fund* (1996) 50 Cal.App.4th 1093, 1112; *Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 48.) The elements of promissory estoppel are "'[a] promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" (*C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 6.)

Promissory estoppel might have been a promising theory for Summer Z. However, Summer Z did not plead a claim for promissory estoppel and therefore cannot recover for it. Summer Z pleaded causes of action for breach of contract and declaratory relief only, and its cross-complaint did not allege any facts that might satisfy the elements of promissory estoppel.

Defendants argue they asserted estoppel and waiver in their answer as their 17th affirmative defense, but affirmative relief cannot be claimed in an answer (Code Civ. Proc., § 431.30, subd. (c)) and affirmative defenses are limited to defeating the plaintiff's recovery (*Morris Cerullo World Evangelism v. Newport Harbor Offices & Marina, LLC* (2021) 67 Cal.App.5th 1149, 1158-1159). Moreover, Defendants' 17th affirmative defense pleaded a generic estoppel defense, did not mention promissory estoppel, and did not allege a promise or any facts in support of a claim of promissory estoppel.

46

5. *Summer Z Did Not Plead a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing*

Defendants argue the mandatory injunction was appropriate to enforce the Lease's implied covenant of good faith and fair dealing, which the trial court found to impose an obligation on the Landlords to complete the roofing work. But Summer Z did not allege breach of the implied covenant of good faith and fair dealing: The cross-complaint does not even mention implied covenants.

A plaintiff asserting a claim for breach of the implied covenant of good faith and fair dealing must allege the defendant unfairly interfered with or frustrated the plaintiff's right to receive the benefit of the contract. (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395; see CACI No. 325 [elements of claim].) The plaintiff must allege "a reasonable relationship between the defendant's allegedly wrongful conduct and the express terms or underlying purposes of the contract." (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 528, disapproved on another ground in *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 939, fn. 13.)

No such allegations appear in Summer Z's cross-complaint. The cross-complaint's breach of written lease cause of action was based on the notices of default served by Summer Z. Notice of Default No. 1, which asserted the Landlords were in default of the Lease for failing to complete the roofing work, did not assert a breach of the implied covenant of good faith and fair dealing. Neither the cross-complaint nor Notice of Default No. 1 alleged a relationship between the Landlords failure to replace the roof and any express provision of the Lease. Defendants' trial brief did not mention breach of the implied covenant of good faith and fair dealing, and it was not mentioned by Defendants' counsel in opening statement.

The first and only time Defendants raised the implied covenant of good faith and fair dealing was during their counsel's closing argument. This argument was

47

brief to the point of being cryptic, and the Respondents' Brief does not even mention it.[16] Instead, Summer Z contends it raised the implied covenant of good faith and fair dealing in the 10th affirmative defense to the Landlords' complaint and "generally" in the cross-complaint's declaratory relief cause of action. As we have stated, affirmative relief may not be recovered by means of an affirmative defense. (*Morris Cerullo World Evangelism v. Newport Harbor Offices & Marina, LLC, supra*, 67 Cal.App.5th at pp. 1158-1159.) The implied covenant of good faith and fair dealing is not mentioned in Summer Z's declaratory relief cause of action, which broadly alleged a judicial declaration was necessary "to enable the parties to determine their rights, duties and obligations under the Lease and California Law."

Further, the implied covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349-350.) We conclude *infra*, the Lease does not impose a duty on the Landlords to complete the roofing work; the implied covenant of good faith and fair dealing therefore cannot impose that duty.

C. *The Maintenance and Repair Provision and Duty by "Default"*

Defendants argue a duty to replace the roof is imposed on the Landlords by implication rather than by express Lease provision – Defendants argue that because the maintenance and repair provision does not impose on them a duty to replace the roof, that duty fell by "default" on the Landlords.

No extrinsic evidence was offered regarding the meaning of the Lease; therefore, we determine the intention of the parties as a matter of law based on the plain language of the Lease, viewed as a whole. (*Frittelli, Inc. v. 350 North Canon Drive, LP*

_____

[16] Counsel's entire argument on that subject was the following: "The third legal theory . . . on requiring [the Landlords] to replace this center portion of the roof, implied covenant of good faith and fair dealing. Here, they started it. That covenant, they're basically frustrating our purpose, preventing us from effectively operating our restaurant. That covenant requires them to complete the job as well."

(2011) 202 Cal.App.4th 35, 44; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955.)

Defendants argue paragraph 35 of the Lease, the maintenance and repair provision, does not impose a duty on them to replace a dilapidated roof. They are correct. "[A]bsent an express provision (or undisputed extrinsic evidence) showing a tenant has an obligation to replace a roof, a tenant's obligation to maintain or repair the premises (including a roof) does *not* include an obligation to replace an old, dilapidated roof with a new roof at tenant's expense." (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1272.) "A lease requiring the tenant to 'repair and maintain' the premises does not include a duty to *replace* a dilapidation on the premises absent express provision in the lease to that effect or undisputed extrinsic evidence to the contrary." (Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2021) ¶ 4:192.1, p. 4-79.) A tenant's covenant to repair and maintain the premises does not mean the tenant has assumed the duty to make repairs of a substantial nature. (*Sewell, supra*, 70 Cal.2d at p. 674 & fn. 10; see *Brown v. Green* (1994) 8 Cal.4th 812, 823.)

It is important again to point out the roofing work on the Restaurant Building is not truly a replacement of the roof. The roofing work consisted of placing a membrane over the existing roof structure and did not involve replacing the structural elements of the roof except possibly to repair or replace some plywood sheathing. Although the trial court used the term "replacement of the roof" throughout the statement of decision, placing a membrane over an existing roof structure could be maintenance and repair rather than replacement. The Landlords would have no duty to complete the roofing work if it were maintenance and repair.

The absence of a lease provision requiring a tenant to replace a dilapidated roof does not mean the landlord, by default, has that duty. There is a third option: There simply might not be an obligation under a maintenance and repair provision to replace or

49

correct a dilapidation. The California Supreme Court has recognized that option as valid: "[A] private property owner is under no general duty to correct defective conditions, and the fact that he leases the premises to another does not alter the rule. [Citations.] Similarly a lessee is under no general duty to correct defective conditions on the leased premises except when necessary to prevent waste or to rectify dilapidations caused by his own lack of ordinary care. [Citations.] Thus, with regard to the duty to repair or maintain, many dilapidations may go unrectified, neither the lessor nor the lessee having a duty to ameliorate the condition, but each having assumed the risk that the dilapidation will decrease the use or value of his interest." (*Sewell, supra*, 70 Cal.2d at p. 671, fn. omitted; see *Western Motors Corp. v. Land Dev. etc. Co.* (1957) 152 Cal.App.2d 509, 513 ["even though the tenant is under no duty to replace but only to repair, this does not mean that the landlord is under a duty to replace"].)

Defendants, by accepting an assignment of the Lease, assumed the risk the aging and dilapidated roof might fail and decrease the value of their present possessory interest. The Landlords, by entering into the Lease and accepting the assignment to Defendants, assumed the risk the aging and dilapidated roof might fail and decrease the value of the reversion interest. Either side could step forward and take the necessary actions to protect their respective interests, but the maintenance and repair provision of the Lease did not *require* any of them to do so.

In *Sewell*, the lessee operated a trailer park having no connections to the local sewer line. (*Sewell, supra*, 70 Cal.2d at p. 670.) The Department of Public Health ordered the lessee to comply with local ordinance by connecting the trailer park sewage system to nearby public sewer lines or cease using the premises as a trailer park. (*Ibid*.) The question presented to the California Supreme Court was which party, lessor or lessee, had the duty under the terms of the lease and applicable law to comply with the Department of Public Health's order. (*Id.* at p. 671.)

50

In resolving that issue, the court distinguished between "two similar but unrelated duties" arising out of the covenant of maintenance and repair. The first duty, which was not directly involved in *Sewell*, was "the duty to repair or maintain the premises in the absence of special laws or government order." (*Sewell, supra*, 70 Cal.2d at p. 671.) In that situation, "[s]ince no general public policy requires that private property and the improvements thereon be maintained in good condition at all times, a private property owner is under no general duty to correct the defective conditions, and the fact that he leases the premises to another does not alter the rule." (*Ibid.* fn. omitted.)

The second duty arises when special laws or government orders require preventative or reparative action be taken. (*Sewell, supra*, 70 Cal.2d at p. 672.) In that situation, "public policy requires someone at all times be obliged to comply with such laws and orders, and parties to a lease will not be permitted to create a hiatus in their respective duties of compliance" and "[o]ne or more of the parties interested in the property must therefore be obliged to comply with some or all of the laws and orders affecting the premises." (*Ibid.*)

In *Sewell*, the matter of the sewer connection fell within the second duty, not the first duty, because the Department of Public Health had issued an order requiring action be taken. (*Sewell, supra*, 70 Cal.2d at p. 671.) The Supreme Court looked beyond the maintenance and repair covenant of the lease, in particular to the compliance with laws provision, to determine the parties' intent as to whether the landlord or tenant had assumed the risk of such repairs. (*Id*. at pp. 672-674.) The court identified six factors "that offer insight into the probable intent of the parties." (*Id*. at pp. 674-675, fn. 10.)[17] The determination of the parties' intent—what might be called the *Sewell* analysis—thus

---

[17] Those factors are: "(1) the relationship of the cost of the curative action to the rent reserved, (2) the term for which the lease was made, (3) the relationship of the benefit to the lessee to that of the reversioner, (4) whether the curative action is structural or non-structural in nature, (5) the degree to which the lessee's enjoyment of the premises will be interfered with while the curative action is being undertaken, and (6) . . . the likelihood that the parties contemplated the application of the particular law or order involved." (*Sewell, supra*, 70 Cal.2d at pp. 674-675, fn. 10.)

allocates responsibility for compliance with "government-ordered alterations."  (*Brown v. Green, supra*, 8 Cal.4th at p. 816.)

A Ninth Circuit decision, *Prudential Ins. Co. of America v. L.A. Mart* (9th Cir. 1995) 68 F.3d 370 (*Prudential*), provides guidance in understanding and applying *Sewell*.  In *Prudential*, the owner/lessor of a 12-story commercial building called the Mart Building brought an action for declaratory relief to establish which party, the lessor or lessee, had duty to pay for seismic upgrading to the Mart Building.  (*Id*. at p. 371.) Engineer reports concluded that without a seismic upgrade, the Mart Building likely would suffer severe damage in a seismic event; however, no government ordinance or order required the upgrade, and the building was in compliance with all building codes. (*Id*. at p. 372.)  The lessor contended the lease, which had a broadly drafted repair and maintenance provision and a compliance with laws provision, placed the duty on the lessee to pay for the seismic upgrades.  (*Id.* at pp. 371, 373-374.)  The lessee contended it had no duty to make or pay for the seismic upgrades because the Mart Building had no existing damage and no government ordinance or order required those upgrades be made. (*Id*. at p. 371.)

The Ninth Circuit affirmed summary judgment in favor of the lessee and concluded it did not-at least not yet-have the duty to make or pay for seismic upgrade of the Mart Building.  (*Prudential, supra*, 68 F.3d at pp. 371, 378.)  The Ninth Circuit analyzed *Sewell* and found significant the distinction between the two duties described in that case.  (*Id*. at p. 376.)  The Ninth Circuit explained how the *Sewell* court faced the second duty – a government order required the reparative work – and that situation provided the "context for its analysis of factors informing the intent behind the covenant to repair."  (*Id*. at p. 377.)  "The *Sewell* analysis," the Ninth Circuit concluded, "is dependent on the existence of such orders."  (*Ibid*.)  In *Prudential*, the lessor's case was "unripe" because no governmental ordinance or order yet required the seismic upgrade: "Should the state or local government decide to enforce a seismic upgrade policy

52

affecting buildings such as the Mart Building, and should [the lessee] refuse to comply or bear the costs of compliance, [the lessor] could then bring a case for relief and ask the district court to interpret the lease in light of the *Sewell* factors." (*Ibid.*)

*Prudential* differs from this case in that the issue presented there was only whether the lessee had the duty to make or pay for the seismic upgrades: the lessee did not assert the lessor was required by the lease to make or pay for the upgrades. The present case presents the same issue but in reverse: Do the Landlords have an obligation to complete the roofing repairs or replace the roof?[18] *Prudential* is relevant and useful because it explains how the *Sewell* analysis is used only in disputes coming within the second duty identified in *Sewell*, and that duty arises only when a governmental ordinance or order specifically requires the reparative work. Otherwise, the dispute falls within the first duty, in which case no party has an obligation to replace a dilapidated roof or other structure on the leased premises.

The present case, unlike *Sewell* and like *Prudential*, falls within the first duty because there are no special laws or government orders requiring the roof of the Restaurant Building to be replaced or repaired. The notices issued by OCHCA were not directed to the roof but to rodent infestation and holes in the ceiling in the Restaurant Building's interior. The OCHCA deemed those problems to be corrected and the Restaurant Building passed subsequent inspections. The default position under the first duty identified in *Sewell* is the property owner has no obligation, absent an express lease provision, to replace or correct a defective condition of the leased premises. (*Sewell, supra*, 70 Cal.2d at p. 671, fn. omitted.) That is also the default position in the present case: The Landlords have no obligation to replace or make substantial repairs to the Restaurant Building roof. If and when the government or one of its agencies issues an

---

[18] Due to the scope of the 30-day Notice, the issue whether that obligation falls on Defendants is relevant only in determining the Landlords' obligations. In other words, if the obligation to complete the roofing work fell on Defendants, then it likely would not fall on the Landlords too.

53

order or enacts a law specifically requiring the roof on the Restaurant Building be replaced or the roofing work completed, then a *Sewell* analysis might be necessary to determine how the parties to the Lease intended to allocate responsibility for compliance. But not yet.

The Landlords contend paragraphs 15 (Damages to Real or Personal Property) and 16 (Destruction of Premises) affirmatively absolves them of any obligation to replace the roof or complete the roofing work while paragraphs 35 (Repairs), 9 (Compliance with Laws in Use), 12 (Indemnification of Landlord), and 21 (Compliance with Laws by Tenant) place the obligation for the roofing work on Defendants. Those provisions of the Lease do not absolve the Landlords of responsibility for the roof or necessarily impose on Defendants the duty to complete the roofing work. Paragraph 15 absolves the Landlords of any liability for damage to the leased premises "from any other cause whatsoever"; in other words, the Landlords are not responsible for damage done to the interior of the Restaurant Building caused by the roof leaks. Defendants have never sought reimbursement from the Landlords for the costs of repairing the interior of the Restaurant Building.

Paragraph 16 of the Lease governs responsibility for "repair, reconstruction, and restoration" only in the event the Restaurant Building is damaged by "fire, earthquake, or other casualty." The term "'casualty'" is synonymous with accident, that is "'something out of the usual course of events, and which happens suddenly and unexpectedly, and without any design on the part of the person injured.'" While rain is becoming distressingly less likely in Southern California, it does not qualify as "casualty." (*Ritchie v. Anchor Casualty Co.* (1955) 135 Cal.App.2d 245, 252; see *Price v. Occidental Life Ins. Co.* (1915) 169 Cal. 800, 802; *Richards v. Travelers Ins. Co.* (1891) 89 Cal. 170, 175.) Paragraph 16 therefore does directly concern the roof, which was failing due to causes other than fire, earthquake, or casualty.

Paragraph 12 of the Lease is an indemnity provision by which the tenant agrees to indemnify the landlord for any loss or damage by reason of injury to or death of any person, or damage or injury to property, "from any cause or causes whatsoever, if in any way connected with the leased premises." The plain meaning of paragraph 12 is the tenant must indemnify the Landlord for *money damages* from liability to *third parties*, the tenant, or the tenant's officers and agents, for property damage or personal injury from any cause related to the leased premises. Paragraph 12 means if somebody is injured or suffers damages from the dangerous condition that is the subject of the dangerous condition finding, Defendants would be required to indemnity the Landlords for any damages they had to pay. Paragraph 12 might create an incentive for the tenant to make repairs or replace dilapidations, but it does not impose a duty to do so.

Paragraph 11 of the Lease enjoins Defendants from committing waste or permitting anything to be done with the Restaurant Building that would conflict with any law, ordinance, rule, or regulation. It might have been the case that the manner in which Defendants maintained the roof and the Roof Equipment constituted waste; however, the 30-day Notice did not identify the failure to repair, maintain, or replace the roof or the Roof Equipment, or to remove the Roof Equipment, as a breach of or failure to perform under the Lease. We have been directed to no law, ordinance, rule, or regulation specifically requiring the roof to be in a particular condition. Paragraph 21 (Compliance with Laws by Tenant) does not necessarily impose on Defendants the duty to finishing the roofing work because "the general rule is that a lessee's unqualified covenant to comply with applicable laws, standing alone, does not constitute an assumption of the duty to comply with those laws that require curative actions of a 'substantial' nature." (*Sewell, supra*, 70 Cal.2d at p. 674.)

The Lease provisions cited by the Landlords are inconclusive: they do not affirmatively impose a duty on the tenant to make substantial repairs, nor do they necessarily relieve the tenant of such duty. Those provisions, by their inconclusive

55

nature, reinforce our conclusion the Lease did not impose a duty on either the Landlords or Defendants to complete the roofing work or replace the roof on the Restaurant Building.

D. *A Final Word on the Roof Equipment*

The Roof Equipment is perhaps the primary cause of the parties' disputes and the damage to the Restaurant Building. It was the parties' impasse over responsibility for disassembling and removing the Roof Equipment that caused the work on the roof to come to a halt, which meant the center portion of the roof, the leakiest part, was exposed to rainfall, which seeped through and caused the damage to the kitchen area of the Restaurant Building.

Based on the finding the Roof Equipment was the Landlord's property, the trial court concluded Defendants had no obligation to replace the extensive ductwork, remove various items of debris from the roof, or fix or remove the swamp cooler. This conclusion is partly erroneous. Defendants owned a present possessory interest in the Roof Equipment (*Avalon Pacific, supra*, 192 Cal.App.4th at p. 1190) and had an obligation under the Lease to keep the demised premises, which includes the roof and the Roof Equipment, in good condition and repair.

We have addressed the matter of the swamp cooler: Defendants had an obligation to comply with the California Retail Food Code by installing a functional makeup air unit and, concomitantly, to remove the old swamp cooler. Defendants failed to do so.

The evidence established there was debris on the roof, including a rusted and unused sheet metal "cage" and a louvered vent. Removal of any debris, on the roof and maintenance of the HVAC system came within Defendants' maintenance and repair obligations under the Lease. Defendants also had the obligation to repair and maintain the ductwork in good condition. The obligation to disassemble, remove, and reinstall the ductwork and other Roof Equipment would fall on the party having the responsibility to

56

complete the roofing work or replace the roof – except, however, Defendants would have the duty to remove all nonfunctioning equipment and debris. The obligation to replace the ductwork, if necessary, depends on application of the principles explained in part V.C of the Discussion section.

### VI. Damages on Summer Z's Cross-complaint

On Summer Z's cross-complaint, the trial court concluded the Landlords breached the Lease by withholding approval of the sublease to Lily Brie, Inc. The court found the Landlords acted unreasonably in withholding approval because: "[The Landlords] had been accepting rent checks every month from Lily Brie[, Inc.] for six years, they knew the Zervos family members continued to operate the restaurant, the sub-lessor, Summer Z, would remain liable on the original lease, and until the heavy rains of October 2016 there had been no problems or conflicts with the operation of the restaurant. Had the Zervos family requested approval of the sublease back in 2010 there is little doubt [the] [L]andlords would have provided their consent without concern, as they did multiple times in the past. It was litigation animus that inspired the recalcitrance to consent and cause cross-complainant to incur the unnecessary expense of switching permits and licenses back in . . . the name of Summer Z." The trial court awarded Summer Z $2,000 in damages, which was the cost of "switching all of the permits, licenses, and insurance necessary to operate the restaurant back to [Summer] Z."

The Landlords challenge the trial court's decision on several grounds, one of which we find to be dispositive. The Landlords argue they did not cause the damages awarded Summer Z but instead those damages were "self-inflicted" because the permits, licenses, and insurance policies for Sunny's and the Restaurant Building should have already been in the name of Summer Z, the tenant under the Lease.[19] We agree.

---

[19] The trial court made no findings on the issue whether the costs of transferring the permits, licenses, and insurance policies were damages actually suffered by Summer Z. The Landlords brought this omission to the trial court's attention and, therefore, we infer no implied findings.

The 2009 Amendment and Assignment made Summer Z the tenant under the Lease. Paragraph 5 of the Lease states the leased premises are to be used by "*Tenant* for the purposes of conducting a restaurant, coffee shop therein." (Italics added.) Paragraph 36 states the *tenant* shall procure and maintain the required insurance, and paragraph 49 requires all insurance policies be made for the "joint benefit and protection of Landlord and *Tenant*." (Italics added.) Under paragraphs 9 and 21 of the Lease, the *tenant* is required to comply with all laws. Thus, all permits, licenses, and insurance policies should have been in the name of Summer Z once it became the tenant under the Lease. Summer Z chose instead to have the licenses, permits, and insurance policies issued to Lily Brie, Inc. That decision, and not the Landlords' withholding of consent to the sublease to Lily Brie, Inc., was the cause of Summer Z's damages.

## DISPOSITION

The judgment on the Landlords' complaint is reversed as to the breach of contract and ejectment causes of action in one respect: Defendants are deemed to be in breach of the Lease for failing to have a functioning makeup air unit at the Restaurant Building. The matter is remanded with directions to the trial court to determine whether such breach was material and for other proceedings related to that determination. In all

other respects, the judgment on the complaint is affirmed.  The judgment on Summer Z's cross-complaint is reversed with directions to enter judgment in favor of the Landlords.

No party shall recover costs because all prevailed in part and lost in part.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.